BOWN BROTHERS, INC., Respondent, *v.* MERCHANTS BANK OF ROCHESTER, Appellant.

Fourth Department, December 23, 1925.

Banks and banking — action to recover amount of drafts on Swedish buyers of goods from plaintiff, which drafts defendant bank agreed to collect — war time contract — British government required buyers to sign form that goods would not be shipped to enemy country — usual course of collection was through British bankers — after drafts were issued Swedish law required buyers to sign Swedish form differing somewhat from British form — buyers refused to sign British form and goods were seized and sold — another method of collection was available — defendant failed to inform plaintiff of exact facts — defendant is liable.

The defendant bank is liable to the plaintiff for the amount of drafts on Swedish buyers of goods bought from the plaintiff on a c. i. f. contract during the World War, which drafts were given to the defendant for collection, since it appears that while the usual method for the collection of the drafts at that time was through British bankers, there was another method available to the defendant; that the British government which assumed control of goods shipped to neutral countries required the buyers to sign a form to the effect that they would not ship the goods to enemy countries; that subsequently a Swedish law required all Swedish buyers to sign a Swedish form differing somewhat from the British form; that when the drafts were presented to the buyers they refused to sign the British form on the ground that it was contrary to the Swedish law, but were willing to sign the Swedish form, and were willing to accept the goods; that the defendant, although another method of collection was available, did not make use of it and did not inform the plaintiff of the exact facts and of the reason why the buyers could not sign the British form.

It was the duty of the defendant to exercise a high degree of fidelity in the performance of its duties relating to the collection of the drafts, and it was negligent in not informing the plaintiff of the exact situation and in not collecting the drafts by means available to it of which it had knowledge.

SEARS, J., dissents in memorandum.

APPEAL by the defendant, Merchants Bank of Rochester, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Monroe on the 28th day of November, 1924, upon the decision of the court rendered after a trial before the court at the Monroe Trial Term, a jury having been waived.

*Macomber & Skivington* and *Lord, Day & Lord* [*George de Forest Lord* and *Sherman Baldwin* of counsel], for the appellant.

*Benton, McKay, Bown & Johnson* [*Carlton F. Bown* of counsel], for the respondent.

DAVIS, J.:

Six actions involving claims of the same nature were tried together before the court and resulted in a judgment for plaintiff. Liability of the defendant was based upon its failure to collect certain foreign drafts. The facts are not in dispute. From the facts as stipulated the court was authorized to draw reasonable inferences.

It appears that in 1916 plaintiff was making sales of evaporated fruits in Sweden c. i. f. Malmo. Drafts to which were attached certain shipping documents (which we will call bills of lading) were to be presented to the buyer. Upon acceptance and payment the latter became entitled to delivery of these documents. The plaintiff intrusted to defendant the duty of making collection of these drafts. Defendant forwarded the drafts to its New York correspondents, who in turn forwarded them to its London correspondents.

This was during the period of the European war and the British government was assuming to exercise surveillance over foreign trade, so that food products would not reach the Central Powers through neutral countries. The British fleet was seizing some vessels carrying goods to neutral ports.

To insure freedom from British seizure, it was necessary for the purchaser to make declaration that the goods would not be re-exported to countries at war with Great Britain. The British government had formulated a certificate known as the " British form." Evidently British bankers were required to use this form in making collection of drafts representing foreign shipments. But there were available methods by which collection could be made

direct by other banking firms without using this form. It does not appear that this fact was known to plaintiff until after the loss.

In March, 1916, the first drafts were sent. These were held up by the London correspondent, and defendant was advised through the New York correspondent that before undertaking items for collection drawn on European countries the London bank desired to receive confirmation that documents were only to be delivered to the consignees upon their signing and delivering the British form. This was called to the attention of plaintiff. It assented and collection was made.

On April 17, 1916, a law was enacted in Sweden providing a form of neutrality declaration and requiring this form and no other to be used by Swedish subjects. It differed somewhat from the British form but provided that the goods were exclusively for consumption in Sweden and would not be re-exported. Neither the plaintiff nor the defendant had actual knowledge of the adoption of this law at the time the drafts in suit were made in May, 1916.

Shipments were made from New York on different vessels during May, 1916. The parties are in agreement that the purchasers became legally obligated for the purchase price at the time the goods were so shipped. It only remained for the plaintiff to cause the drafts with bills of lading attached to be presented to the buyers and receive its money. It was this duty that defendant undertook to perform.

We may assume that defendant through its correspondents presented the drafts to the buyers with reasonable promptness. With the drafts were presented the British form of neutrality declaration. The buyers refused to sign this form on the ground that they were prohibited from so doing by the Swedish law. They offered to sign the Swedish form and were ready and willing to accept and pay the drafts and take the bills of lading. The agent of defendant refused to deliver them on these terms.

The defendant then notified plaintiff that the drawees were " unable to sign the declarations attached to these items," and asked for plaintiff's instructions. The plaintiff without further information as to the cause of non-acceptance notified defendant it was cabling its broker in Sweden in connection with the refusal of the consignees to sign the British form and accept the drafts. It was not, until some time later that plaintiff received notice that it was the Swedish law which prevented the consignees from signing the British form and was asked for further instructions. Then plaintiff advised that it appeared that the consignees were being asked to break the laws of Sweden and that the signing of the British form should be waived. Subsequently plaintiff received

notice of protest of the drafts, and shortly thereafter asked defendant to have them returned. In the meantime the vessels containing the merchandise had been seized by the British. The drafts have remained uncollected. The goods were sold in the Prize Court. Plaintiff received only a small sum from this sale. No question has been raised as to the possibility of collection from the buyers, but it seems to be conceded that plaintiff has lost the balance uncollected on the drafts. Only the liability of the defendant therefor is in dispute. The plaintiff has recovered on the theory that the defendant was negligent in its attempt to collect.

If the buyers and defendant's agent had been able to agree on a form of neutrality declaration, no doubt the goods would not have been seized, or if seized, would have been promptly released. The entire difficulty arose, therefore, when on presentation of the drafts the buyers found themselves unable under the law of their country to sign the British form. With knowledge of these facts, was the defendant's agent legally justified in its insistence on a condition impossible of performance before it surrendered the bills of lading and accepted payments on the drafts? Is the plaintiff left without remedy because it assented originally to a condition then possible to perform but subsequently made illegal, that drafts should be accompanied by the British form and bills of lading surrendered only when that form was signed?

The main theory upon which plaintiff has recovered is, as we have said, the negligent performance of defendant's duty to collect. The defense is, in substance, that the contract contemplated that the British form was to be used, and signature thereof by the drawees was a material condition precedent to the defendant's obligation to surrender the documents and collect the drafts; that the fact the buyer was precluded by law from signing is no concern of defendant; and that it has fully discharged its duty in presenting the drafts and demanding signature of the British form.

We do not regard this defense as sound. A bank assuming duties of this character acts as an agent and is charged with duties of a fiduciary nature. It is bound to exercise a high degree of fidelity and diligence in the performance of those duties. (*First National Bank of Meadville* v. *Fourth National Bank*, 77 N. Y. 320, 325; *Isham* v. *Post*, 141 id. 100, 106; *Krafft* v. *Citizens' Bank*, 139 App. Div. 610, 614; *Diamond Mill Co.* v. *Groesbeeck National Bank*, 9 Tex. Civ. App. 31.) It usually knows, as the principal does not, the proper channels through which to make collection and the proper methods to be adopted. It is bound to a high duty of loyalty to its principal. It is given wide discretionary powers,

and it selects its subagents and is bound to exercise reasonable care and judgment in making such selection and in giving such agents proper instructions. It is, of course, liable for their defaults. (*St. Nicholas Bank* v. *State National Bank,* 128 N. Y. 26; *National Revere Bank* v. *National Bank of Republic,* 172 id. 102, 107; *McBride* v. *Illinois National Bank,* 138 App. Div. 339.) As between the interests of its principal and those of the subagent, it can have but one choice. It must be asusmed as a fair inference from the stipulated facts that defendant knew of the direct method of collection commonly known by bankers, whereby the British form was not essential. So when defendant selected the British correspondent and submitted, and in effect recommended to its principal the conditions as to the British form, it was exercising the discretionary powers intrusted to it and upon which plaintiff was relying. That proper methods of collection would be used was an implied part of the contract. (*Exchange National Bank* v. *Third National Bank,* 112 U. S. 276, 289.) If defendant knew at the time that the method adopted was not proper and feasible, then it failed in its duty. If that fact was subsequently discovered, then its duty was clear, to wit, to adopt immediately some more appropriate course and give full notice of the difficulty to plaintiff. The knowledge of the agent of facts making collection difficult was defendant's knowledge.

The plaintiff was interested only in the collection of its drafts. The method it intrusted to the superior skill and knowledge of the defendant. The plan selected was entirely for the benefit of the subagent. It was not a material part of the original contract but a mere detail in its execution. The possibility of its performance rested on the state of the Swedish law at the time. This law and changes made therein were presumptively known to the London agent doing business in Sweden. (*Hill* v. *Spear,* 50 N. H. 253, 261.) The parties all knew that foreign commerce and exchange are regulated and restricted by governments, and that the Kingdom of Sweden had power to prescribe the form of certificate its citizens should use. The performance of that detail of the contract as to the certificate of neutrality was to be in Sweden, and was regulated by the law in force there. (*Hall* v. *Cordell,* 142 U. S. 116; *Union National Bank* v. *Chapman,* 169 N. Y. 538.)

Contracts made with reference to a subject within the restrictive power of a government contain the implied condition that a change in law may be made and the obligations of the parties varied or avoided. (*Fitts* v. *Andrews,* 192 App. Div. 160; *Town of North Hempstead* v. *Public Service Corp.,* 231 N. Y. 447, 450; *Legal Tender Cases,* 12 Wall. 457, 551.) " The obligation of the law

qualifies and in case of conflict overrides the obligation of the contract." (*Postal Telegraph Cable Co.* v. *Associated Press,* 228 N. Y. 370, 375.) " Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government." (*Louisville & N. R. R. Co.* v. *Mottley,* 219 U. S. 467, 482.) The rights of the parties relative to the certificate to be signed, being subject to government restriction, could not be removed from such restriction by a contract contrary to the law. (*Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 357; *People ex rel. City of New York* v. *Nixon,* 229 N. Y. 356, 359.) When the new law became operative the parties were relieved from performance in that manner, for without fault on the part of either, both were disabled from performing. (*Adler* v. *Miles,* 69 Misc. 601; *People* v. *Globe Mutual Life Ins. Co.,* 91 N. Y. 174.)

At the time the drafts in question were given to defendant for collection (May, 1916) the method agreed upon in March relative to the use of the British form was illegal in the country where collection was to be made. We have here not a contract subsequently becoming impossible of performance through a change in the law, but one rendered illegal under the law then in force — assuming that the plaintiff impliedly was bound for future collections by the agreement made relative to the March drafts. This agreement as to method of collection we believe became invalid immediately. It may be that defendant under the circumstances might say it had become impossible for it to perform and might withdraw from further effort to collect, giving full and prompt notice of the facts and of its purpose, with surrender of the drafts. We do not need to decide the question for defendant held the drafts, stubbornly refused to adopt any other method, and without giving plaintiff information of the facts, simply called for instructions.

Under these circumstances the primary obligation to make collection by every reasonable effort still endured. Defendant was not exonerated from its contract because collection became embarrassing or difficult to the agent it selected under the method it had recommended to its principal. It was bound to show that there was no way of obviating the difficulty. (*Beebe* v. *Johnson,* 19 Wend. 500, 502.) It was possible to perform the original contract though now more burdensome on defendant's agent. (*Baker* v. *Johnson,* 42 N. Y. 126.)

Defendant and its agent could not rest supinely on the fact that the Swedish law did not permit the drawees to sign the British form. They were willing to accept and pay, and were not capricious in the refusal to sign. When the method agreed upon became impossible, defendant was bound to use some other method readily

available, if one existed. (*Williams* v. *Vanderbilt*, 28 N. Y. 217; *Van Buskirk* v. *Roberts*, 31 id. 661, 670; *Hart* v. *Myers*, 59 Hun, 420, 423; affd., 128 N. Y. 578.) It was bound to do what a prudent principal would do. (*Exchange National Bank* v. *Third National Bank, supra*, 291.)

Other clear and positive duties to the principal arose when the exigency occurred. Whatever may be the rule about the presumptive knowledge of foreign laws, defendant's subagent on presenting the drafts acquired actual knowledge of the state of the Swedish law. The duty of the London correspondent, who knew that collection could readily be made through other channels, was either to take the available method, accepting the Swedish form, or, if its duty to its own government forbade it, to give full and immediate notice concerning the facts and its position, with a recommendation of what course to follow. The defendant, bound both by the knowledge and the negligence of its subagent, was held to an independent and active duty to discover what was wrong and the reason why collection was not being made, and to take steps for making collection through another channel. The least it could have done was to notify the plaintiff of the facts and leave it free to choose another agent through which it could collect. (*Shipsey* v. *Bowery National Bank*, 59 N. Y. 485, 491; *Second National Bank* v. *Merchants' Nat. Bank*, 111 Ky. 930, 935.) None of these obvious things was done.

In placing responsibility we must keep in mind the existing conditions; the war attended with the greatest hazards ever known to transportation of goods and collection of payments; the difficulty in making communication through ordinary channels to this distant country; and the unexpected contingency concerning which plaintiff was uninformed. Failure to act with such diligence as these circumstances demanded may, as a question of fact, constitute negligence. (*Pinkney* v. *Kanawha Valley Bank*, 68 W. Va. 254, 263; Michie Banks & Banking, § 171, subd. 2; Id. p. 1507; Morse Banks & Banking, § 219; *Edmonstone* v. *Hartshorn*, 19 N. Y. 9.) Such negligence has been found by the learned trial court. We are quite in accord with that determination. (See *Vernier* v. *Knauth*, 7 App. Div. 57, 62.)

The judgment should be affirmed, with costs.

The twenty-first finding of fact is by consent reversed. Such additional findings as may be deemed necessary by either party under the new stipulated facts or otherwise may be settled on three days' notice.

HUBBS, P. J., CROUCH and TAYLOR, JJ., concur; SEARS, J., dissents in a memorandum and votes for reversal upon the law.

Sears, J. (dissenting):

The stipulation that the shipping documents were only to be delivered by defendant to the Swedish consignees upon their signing the so-called " British form " was in my opinion an essential and integral part of the contract between the parties. However, upon the consignees' refusal to sign such form, the defendant was under an obligation to communicate that fact with the reasons therefor to the plaintiff promptly and there is evidence from which negligence in the performance of this obligation in respect to the drafts in actions Nos. 2 to 6 could be found, namely, in the delay from June second to June twenty-first. However, I find no evidence from which it can be found that damages were occasioned by this negligent delay. As to drafts in action No. 1, the plaintiff is shown to have known of the full situation when it was notified by defendant of the dishonor of that draft, and there is, therefore, as to this action a failure to show a breach by defendant of its contract.

Judgment affirmed, with costs.